323 F.Supp.2d 95 (2004)
CAMBRIDGE MUTUAL INSURANCE COMPANY, Plaintiff Counterclaim Defendant
v.
PATRIOT MUTUAL INSURANCE COMPANY, Defendant Counterclaim Plaintiff
Patriot Mutual Insurance Company, Third-Party Plaintiff Counterclaim Defendant
v.
Clark & Bennett Insurance d/b/a CROSS INSURANCE-BELFAST, Third-Party Defendant Counterclaim Plaintiff
Clark & Bennett Insurance d/b/a CROSS Insurance-Belfast, Cross-Claim Plaintiff
v.
Cambridge Mutual Insurance Company, Cross-Claim Defendant
No. CIV. 03-107-P-C.
United States District Court, D. Maine.
April 30, 2004.
*96 *97 Louise K. Thomas, Pierce, Atwood, Christopher R. Drury, Pierce, Atwood, Portland, ME, for Cambridge Mutual Insurance Company, Plaintiff.
James D. Poliquin, Norman, Hanson & Detroy, Anne H. Cressey, Richardson, Whitman, Large & Badger, Portland, for Acadia Insurance Company, Patriot Mutual Insurance Company, Defendants.

MEMORANDUM OF DECISION AND ORDER
GENE CARTER, Senior District Judge.
Kenneth and Kathleen Strickland's house in Monroe, Maine was completely destroyed by fire on December 9, 2002. Cambridge Mutual Insurance Company ("Cambridge"), Patriot Mutual Insurance Company ("Patriot"), and Clark & Bennett Insurance d/b/a Cross Insurance  Belfast ("Cross") have each contributed equally to the Stricklands' fire loss, for a total payment of $240,026.28. Cambridge contends that it was not responsible for the loss and brought this action against Patriot for equitable subrogation (Count III).[1] Patriot counterclaims against Cambridge, arguing that it is entitled to be reimbursed for what it paid into the settlement under the doctrines of equitable subrogation (Count I) and reformation (Count II). Patriot also brings a Third-Party Complaint against Cross for negligence (Count I), breach of the agency agreement (Count II), indemnity (Count III), breach of fiduciary duties (Count IV), and contribution and indemnity (Count V). Third-Party Defendant Cross counterclaims against Patriot for breach of contract (Count I) and equitable subrogation (Count II) and cross-claims against Cambridge for breach of contract (Count I) and mutual mistake (Count II).
The Court now has before it Cambridge's Motion for Summary Judgment wherein it requests that the Court enter summary judgment in its favor, declare that it has no legal liability to cover any portion of the Strickland's fire loss, enter judgment against Patriot for damages in the amount of $80,008.76 together with interest and costs, and enter judgment in its favor on Cross's cross-claims against it. Also before the Court is Patriot's Motion for Summary Judgment requesting that the Court grant summary judgment in its *98 favor on Cambridge's Complaint, Patriot's counterclaims against Cambridge, Patriot's Third-Party Complaint, and the counterclaims of Cross.

I. FACTS
The summary judgment record reveals the following undisputed facts. Cross entered into an agency agreement with Acadia Insurance Company ("Acadia") in June 1992, whereby Acadia authorized Cross to act as its agent in procuring insurance business for it. Affidavit of Royce Cross ¶ 9. On September 10, 2002, Cambridge and Cross entered into an agency agreement whereby Cambridge authorized Cross to act as its agent in procuring insurance business for Cambridge.[2] Cross Aff. ¶ 3. Effective November 1, 2002, Patriot and Cross entered into an agency agreement whereby Patriot authorized Cross to act as its agent in procuring insurance business for Patriot.[3] Cross Aff. ¶ 6. During the month of December 2002, Cross was an insurance agent for Acadia, Cambridge, and Patriot. Cross Aff. ¶¶ 5, 8, 10.
Over the course of 2002, Acadia and Patriot had been working on transferring Acadia's personal lines business to Patriot. Cross received notices from Patriot dated March 12, 2002, October 16 and 17, 2002, and October 25, 2002, regarding the transfer of Acadia's personal lines business to Patriot. Affidavit of Barri L. Bloom ¶ 4. Starting sometime in May to June of 2002, all of Acadia's personal lines underwriting staff became employees of Patriot. Affidavit of Michael Swedo ¶ 6. By December 1, 2002, Acadia did not employ any personal lines underwriters. Swedo Aff. ¶ 7.
On November 25, 2002, Acadia sent a letter to each of its agents enclosing an amendment to the agency agreement regarding personal lines of insurance. Swedo Aff. ¶¶ 3, 4. Cross received the above-referenced letter on November 26, 2002.[4] Bloom Aff. ¶ 4. The Amendment to the Agency Agreement between Acadia and Cross provides in relevant part:
This amendment modifies the terms of the Agreement between "The Agent" [Cross] and "The Company" [Acadia] previously signed by both parties, whereby "The Agent's" authority under Paragraph I., B. to solicit, receive, bind, execute and transmit proposals for insurance contracts to "The Company" for any and all Personal Lines of business is hereby withdrawn and cancelled.
Royce Cross, President of Cross, signed the amendment to the Cross Insurance Agency Agreement with Acadia providing that the amendment would be effective December 1, 2002.[5] Swedo Aff. ¶ 5. As of December 1, 2002, Acadia was completely out of the personal lines insurance business in Maine. Swedo Aff. ¶ 2. However, on December 9, 2002, the agency agreement between Cross and Acadia remained in effect, and Cross was generally authorized to procure insurance business for Acadia. Cross Aff. ¶ 10.
On Tuesday, December 3, 2002, Kenneth Strickland met with Virginia Emery, an *99 authorized insurance agent employed by Cross, to discuss changing the insurance coverage on a house he owned that was located at 82 Curtis Road in Monroe, Maine (the "Property"). Affidavit of Kenneth Strickland ¶¶ 2-3; Deposition of Virginia Emery at 9-10. Ms. Emery was a licensed agent of the Andover Companies, which included Cambridge,[6] and Acadia as of December 3, 2002. Emery Dep. at 7. Mr. Strickland told Ms. Emery that he was renting his home to a third party and he wanted to ensure that he had proper insurance coverage. Emery Dep. at 10. Mr. Strickland also told Ms. Emery that the primary source of heat for the Property was a combination wood/oil furnace. Emery Dep. at 17. During her meeting with Mr. Strickland, and at the suggestion of a co-worker, Ms. Emery telephoned Cambridge to ascertain whether its underwriting guidelines permitted it to issue a dwelling fire policy on Mr. Strickland's Property.[7] Emery Dep. at 18-20, 22; Affidavit of Lucus Cummings ¶ 2.
When she called Cambridge, Ms. Emery attempted to speak with two underwriters with whom Cross normally worked when placing coverage. Emery Dep. at 20, 22. Because those underwriters were unavailable, Ms. Emery asked if there was an underwriter at Cambridge to whom she could speak. Emery Dep. at 23. Ms. Emery was connected to a Cambridge underwriter named Lucas Cummings. Cummings Aff. ¶¶ 2, 6; Emery Dep. at 23, 102-03. Ms. Emery asked Mr. Cummings whether Cambridge could insure a DP3, $260,000 rented dwelling with an wood/oil furnace. Emery Dep.at 23-24; 69. Mr. Cummings explained to Ms. Emery that Cambridge could write a dwelling fire policy to cover a rented dwelling with a wood/oil furnace, provided it was not within twenty feet of other structures. Cummings Aff. ¶ 3. Ms. Emery asked Mr. Strickland whether it was within twenty feet of other structures and Mr. Strickland replied that it was not. Emery Dep. at 24.
When Ms. Emery ended the telephone call with Cambridge on December 3, 2002, she did not believe that Cross had an obligation to place the Strickland business with Cambridge; rather, she felt that Cross could place the Strickland risk with an insurer other than Cambridge. Emery Dep. at 107-08. In addition, Ms. Emery did not know on December 3, 2002, whether she was going to place the Strickland business with Cambridge or some other company. Emery Dep. at 110-11. At that time, however, Ms. Emery did not call any other insurance companies after speaking with Mr. Cummings at Andover on December 3, 2002. Emery Dep. at 29, 32.
After speaking with Cambridge's underwriter on December 3, 2002, and while Mr. Strickland was sitting at her desk, Ms. Emery worked with two other Cross agents, Lisa Archer and Laurene Rich, to calculate a rate premium for the Property. Dep. of Laurene Rich at 19-21; Emery Dep. at 46-47. At that time, Ms. Emery did not know that Ms. Archer and Ms. Rich were using the Acadia Insurance Company rate manual to calculate the Property's premium. Emory Dep. at 105. Ms. Emery then told Mr. Strickland that he needed to provide her with updated photographs of the house as well as a completed woodstove questionnaire before *100 Cross could bind coverage for the Property. Emery Dep. at 29-30; Mr. Strickland Aff. ¶ 5.
Ms. Emery received pictures of the Property during the week of December 3, 2002. Emery Dep. at 31-32. On Friday, December 6, 2002, Kathleen Strickland delivered the completed woodstove questionnaire to Ms. Emery. Mrs. Strickland Aff. ¶ 2; Emery Dep. at 32, 106. At that time, Ms. Emery informed Mrs. Strickland that because her husband's name was on the existing homeowner's policy, he would have to sign the policy release form before she could issue dwelling fire coverage. Mrs. Strickland Aff. ¶ 3.
Mr. Strickland went to the Cross Agency on December 9, 2002, and asked to complete the application for fire insurance on the Property. Mr. Strickland Aff. ¶ 7. Ms. Emery was out of the office sick on December 9, 2002. Rich Dep. at 37. Ms. Rich, therefore, met with Mr. Strickland and completed the application process with him.[8] Rich Dep. at 10, 38, 55, 117, 119. Ms. Rich asked Mr. Strickland specific underwriting questions about the Property and then Ms. Rich completed and executed Mr. Strickland's application for insurance with Acadia. Rich Dep. at 15-21, 65-66, 68, 121, 124-125.
The application lists "Kenneth A. Strickland, Jr." and "Kathleen Thompson [Strickland]" as the applicants, "Cross Insurance  Belfast" as the "producer," and "Acadia Insurance Company" as the "Co/Plan." Then Mr. Strickland wrote out a check for $206 payable to the "Acadia Insurance Company" as a down payment for the Acadia Dwelling Fire Policy. Rich Dep. at 133-34; Mr. Strickland Aff. ¶ 7, Ex. C. Ms. Rich accepted a check made payable to Acadia from Mr. Strickland and issued insurance binder # 466527 to Mr. Strickland to insure his Property. Rich Dep. at 55; Mr. Strickland Aff. ¶ 7.[9] The binder lists "Cross Insurance  Belfast" as "Producer," Acadia Insurance Company" as the "Company" and Kenneth Strickland and Kathleen Thompson"[10] as the "Insured." After completing Mr. Strickland's application, processing the down payment and issuing Mr. Strickland the binder, Ms. Rich placed the completed Acadia application on Ms. Emery's desk so that Ms. Emery could send in the application upon her return. Rich Dep. at 60. On December 9, 2002, after the Acadia binder had issued, Ms. Rich completed a cancellation request policy release form, signed it, and then had Mr. Strickland endorse it to cancel his homeowner's insurance coverage with Patrons Oxford Insurance Company. Rich Dep. at 134-36; Mr. Strickland Aff. ¶ 7, Ex. D. Then Ms. Rich faxed a copy of the binder to Banknorth, the holder of the second mortgage on the Property. Rich Dep. at 138-39.
On December 9, 2002, after Mr. Strickland had paid for the Acadia binder and canceled his Patrons Oxford homeowners' policy, a fire completely destroyed the dwelling at 82 Curtis Road, Monroe, Maine. Mr. Strickland Aff. ¶ 9. Cambridge, Patriot, and Cross have each contributed $80,008.76 to the Stricklands' fire *101 loss and obtained a release and an assignment of the Stricklands' claims against Acadia. Release and Assignment of Claims attached to Plaintiff's Statement of Material Facts as Exhibit G.

II. DISCUSSION
Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 48 (1st Cir.2002). "In this regard, `material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, `genuine' means that `the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir.2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir.1995)). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

A. Cambridge's Motion for Summary Judgment and Patriot's Motion for Summary Judgment Against Cambridge
Cambridge asserts that it is not responsible for any of the Stricklands' loss because Cross bound Acadia to the Strickland risk on December 9, thus resulting in a temporary contract of insurance between Acadia and the Stricklands. The agreement between the parties in this case to dismiss Acadia provides, in part, that "if Acadia was legally obligated to provide insurance coverage to the Stricklands, then Patriot is obligated to pay the Stricklands to the same extent that Acadia would have been." Stipulation of Dismissal Without Prejudice (Docket Item No. 22) ¶ 3. On this basis Cambridge moves for summary judgment on its claim against Patriot for equitable subrogation. Equitable subrogation "is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it." Unity Tel. Co. v. Design Serv. Co., 160 Me. 188, 192, 201 A.2d 177, 179 (1964). The doctrine requires that the equities of the parties be weighed and balanced. Id. at 193, 201 A.2d at 179. Equitable subrogation is itself based on principles of unjust enrichment and restitution.[11]North East Ins. *102 Co. v. Concord Gen. Mut. Ins. Co., 433 A.2d 715, 719 (Me.1981).
Patriot and Cross disagree with Cambridge, arguing that, although Acadia is the named insurer on the binder in effect at the time of the loss, Cambridge is responsible for the Stricklands' loss because a mutual mistake of the parties made the binder ineffective and further that an implied contract of insurance between Cambridge and Mr. Strickland arose on December 3, when Ms. Emery contacted Cambridge and that contract remained in effect on the date of the fire. In addition, Patriot alleges that Cross lacked the authority to bind Acadia to the Strickland risk as of December 9, 2002, because as of December 1, Cross was no longer authorized to sell Acadia's personal lines of insurance. The Court agrees with Cambridge and concludes that Acadia was bound by Cross to insure the Property on December 9 and that Acadia, and thus Patriot, is responsible for the part of the Stricklands' loss paid by Cambridge.

1. Existence of a Temporary Contract of Insurance with Acadia
Patriot contends that Cross did not have actual or apparent authority to bind Acadia to insure the Property. Specifically, Patriot points out that through the last few months of 2002, Acadia had been working diligently to place all of its agents on notice that they no longer had authority to bind Acadia in any personal lines of insurance. Patriot argues that, in the absence of evidence of any manifestation by Acadia to the Stricklands that Cross was authorized to bind dwelling coverage in December of 2002, Cross did not have authority to bind Acadia. Cambridge disagrees, relying on section 2422 of the Maine Insurance Code.
Section 2422 of Maine Insurance Code provides:
1. An agent authorized by an insurer, if the name of such agent is borne on the policy, is the insurer's agent in all matters of insurance. Any notice required to be given by the insured to the insurer or any of its officers may be given in writing to such agent.
2. The authorized agent of an insurer shall be regarded as in the place of the insurer in all respects regarding any insurance effected by him. The insurer is bound by his knowledge of the risk and all matters connected therewith. Omissions and misdescriptions known to the agent shall be regarded as known to the insurer and waived by it as if noted in the policy.
24-A M.R.S.A. § 2422 (2003).[12] Interpreting this statute, the Law Court has stated that "the undoubted purpose of [the] statute is to make it as safe for persons seeking insurance to `deal with the agents, with whom they ordinarily transact their business, as if they were dealing with companies themselves.'" County Forest Products, Inc. v. Green Mountain Agency, Inc., 2000 ME 161, ¶ 23, 758 A.2d 59, 65 (2000) (quoting Hurd v. Maine Mut. Fire Ins. Co., 139 Me. 103, 113, 27 A.2d 918, 924 (Me.1942)). The Court notes that as of December 1, 2002, Acadia had not revoked Cross's authority to serve as its agent altogether; rather, Acadia had simply *103 withdrawn Cross's authority to write personal lines of insurance for Acadia. Unlike other provisions of the Maine Insurance Code, section 2422 does not make a distinction between personal lines and commercial lines. The statute simply states "An agent authorized by an insurer, if the name of such agent is borne on the policy, is the insurer's agent in all matters of insurance." 24-A M.R.S.A. § 2422 (2003). Therefore, pursuant to section 2422, Cross had statutory authority as Acadia's insurance agent to bind Acadia to the Stricklands' dwelling fire policy.
Moreover, Cross did bind Acadia to the Strickland risk on December 9, 2002. Here, it is undisputed that on December 9, 2002, Cross was Acadia's agent and that Ms. Rich was a licensed agent for Acadia. The record indicates that on December 9, 2002, Ms. Rich completed the dwelling fire application and binder that contained the names of both Cross and Acadia. As explained above, Cross, as an insurance agent, had statutory authority to bind Acadia to the Stricklands dwelling fire policy even in the absence of contractual authority to procure personal lines of insurance for Acadia. Therefore, the Court concludes that on December 9, 2002, Cross bound Acadia to a temporary contract of insurance between Acadia and the Stricklands to cover the Property. See, e.g., Southeastern Colorado Homeless Ctr. v. West, 843 P.2d 117, 118 (Colo.App.1992)("A binder has been defined as a temporary or preliminary contract of insurance ..."); Terry v. Mongin Ins. Agency, 105 Wis.2d 575, 581, 314 N.W.2d 349 (1982)("A binder is a contract of insurance in contemplation of a subsequent and more formal agreement; a binder is a contract for temporary insurance.").

2. Mutual Mistake
Patriot and Cross seek the extraordinary remedy of having the Court rewrite the Stricklands' insurance binder to name Cambridge as their insurer based on the doctrine of mutual mistake. Patriot contends that Mr. Strickland and Ms. Rich each were mistaken about facts that are relevant to the transaction. Specifically, Patriot argues that Mr. Strickland's affidavit establishes that he mistakenly believed that Cross had apparent authority to bind Acadia, that Acadia had agreed to insure the Property, and that the Property was insured by Acadia. Patriot also theorizes that another Cross agent, Virginia Emery, "intended" to bind coverage with Cambridge, but a different Cross agent, Laurene Rich, mistakenly wrote the application and binder and accepted a check to Acadia in Ms. Emery's absence. Ms. Rich mistakenly assumed, Patriot alleges, that Acadia would allow her to place dwelling coverage with it in December of 2002. Ultimately Patriot states that because Ms. Rich treated the transaction as belonging to Ms. Emery, and since Ms. Emery intended to place the coverage with Cambridge, Ms. Rich should have carried out Ms. Emery's intent and that her failure to do so was a mistake.
The doctrine of mutual mistake is based on the premise that, in certain circumstances, when both parties to a contract are mistaken about a material term of a contract, a court can reform the contract to meet the actual mutual understanding of the parties. See Sinclair v. Home Indem. Co., 159 Me. 367, 373, 193 A.2d 177, 180 (Me.1963). According to the Law Court, a mutual mistake is "reciprocal and common to both parties, where each alike labors under the misconception in respect to the terms of the written instrument." Yaffie v. Lawyers Title Ins. Corp., 1998 ME 77, ¶ 8, 710 A.2d 886, 888 (1998) (citing Bryan v. Breyer, 665 A.2d 1020, 1022 (Me.1995)) (quoting Horton & McGehee, MAINE CIVIL REMEDIES § 14.16 at 14-19, *104 20 (1994)). "The mistake `must be material to the transaction' and must `touch the subject matter of the bargain and not merely be collateral to it.'" Yaffie, 710 A.2d at 888 (quoting Interstate Indus. Unif. Rental Inc. v. Couri Pontiac, Inc., 355 A.2d 913, 918 (Me.1976)). Mutual mistake of fact must exist at the time the parties enter into the transaction. See Nadeau v. Pitman, 1999 ME 104, ¶ 16, 731 A.2d 863, 867 (1999) ("Events which occur subsequent to execution of a contract and are not contemplated by the parties at the time of execution of the contract, are not a mutual mistake rendering a contract unenforceable."). The party seeking to reform the contract must prove the existence of mutual mistake by clear and convincing evidence. Id.
In order for Cross and Patriot to prevail on their claims of mutual mistake, it must be evident that the insertion of Acadia as the insurer rather than Cambridge was a mistake of fact common to both parties to the contract: Cross and Mr. Strickland. The remedy of reformation is not available to Patriot and Cross, however, because the undisputed facts show that Mr. Strickland was not mistaken when he purchased insurance with Acadia. Here, the undisputed facts demonstrate that Mr. Strickland did not believe that Cambridge was actually his insurer; rather, he believed he was purchasing insurance with Acadia. First, as the Court found above, Cross had the authority to bind Acadia under Maine law, and the binder given to Mr. Strickland on December 9 listed Acadia, not Cambridge, as the insurer. Mr. Strickland understood what he was being offered: dwelling fire insurance through Acadia subject to the terms set forth in the binder. Mr. Strickland accepted this offer by signing the binder and giving Cross a check payable to Acadia. None of the Cross agents ever told the Stricklands that Cambridge was going to be their insurer; rather, Ms. Rich told Mr. Strickland that Acadia was going to insure the Property. Mr. Strickland never believed that he was insured by Cambridge on December 3 or 6. However, on December 9, 2002, Mr. Strickland reasonably believed that Acadia was insuring the Property through a temporary contract of insurance, and he canceled his homeowner's policy with Patrons Oxford on that same day in reliance on the belief that he was insured with Acadia. Thus, the Court concludes the undisputed facts indicate that Mr. Strickland was not "laboring under a mistake of fact" at the time that he purchased his insurance binder with Acadia.

3. Implied Contract of Insurance
Patriot and Cross both claim that Cambridge is responsible for the Strickland loss because of an implied contract of insurance that allegedly existed between Cambridge and the Stricklands as a result of Ms. Emery's December 3 telephone conversation with Mr. Cummings. Specifically, Patriot and Cross argue that in order to demonstrate that there was an implied contract of insurance between Cambridge and the Stricklands, they must show only that: (1) Cross had the authority to bind Cambridge to the Strickland risk, and (2) it is certain that Cambridge would have accepted the Strickland risk had Cross submitted a proper request. See Attleboro Mutual Ins. Co. v. Grange Mutual Ins. Co., 611 A.2d 76, 78 (Me.1992) (citing Utica Mut. Ins. Co. v. St. Paul Fire & Marine Ins. Co., 519 A.2d 185, 186 (1986)). Patriot and Cross contend that Ms. Emery's authority to bind Cambridge and Mr. Cummings's alleged agreement over the telephone that Cambridge would bind coverage are sufficient for the creation of an implied contract. *105 Cambridge does not challenge that Ms. Emery had authority to bind it to an insurance contract, but, rather, argues that it would not necessarily have accepted the risk. As the parties asserting the claim against Cambridge, Patriot and Cross have the burden of proving that there was an implied contract of insurance between Cambridge and the Stricklands.
Patriot and Cross contend that the evidence in the record indicates that Mr. Cummings told Ms. Emery during their December 3 telephone conversation that he would bind the Property. However, there is an issue of fact as to whether Mr. Cummings agreed that he would bind the Property. Assuming that Mr. Cummings did tell Ms. Emery in the December 3 telephone conversation that Cambridge would bind coverage on the Property, the Court nevertheless finds that there is no implied contract in this case.
A contract of insurance cannot be implied in fact by simply meeting the Utica Mutual test. While a party wanting to establish the existence of an implied contract of insurance in Maine must show the agent's authority to bind the insurer and that the insurer would have certainly accepted the risk, general principles of contract law also provide that in order to establish the existence of an implied contract, a party must establish a meeting of the minds. See Stanton v. University of Maine System, 2001 ME 96, ¶ 16, 773 A.2d 1045, 1050 (Me.2001) ("An implied contract `refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words.'" 1 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 1:5, at 20 (4th ed.1990)). The contract may be implied from conduct, but the need for an agreement or an understanding on the part of the contracting parties is indispensable.
Although the understanding of the parties was not discussed in Utica Mutual  the case setting out the test for an implied contract of insurance in Maine  the facts of that case support that the parties believed that the insureds were covered by an insurance policy. In Utica Mutual, the insurance agent issued a fire insurance policy from St. Paul to the insureds for their business, and that policy was renewed each year for fourteen years. Due to a clerical error, the policy was not renewed for the year in which the business suffered a fire loss. The Law Court concluded that an implied contract of insurance existed between St. Paul and the insureds because St. Paul's agent had the authority to bind it and St. Paul would have accepted the risk if requested (as it had in the prior fourteen years). The facts indicate, however, that both St. Paul's agent and the insureds believed that the policy had been renewed and the Property was insured by St. Paul at the time of the fire.
Here, there was never a meeting of the minds between the agents at Cross and Mr. Strickland that the Property was insured prior to December 9. The undisputed record indicates that neither Mr. Strickland nor Ms. Emery believed that the Property was insured on December 3. After Cross ended the telephone call with Cambridge on December 3, 2002, it did not take any actions to bind Cambridge to the Strickland risk, such as asking Mr. Strickland to complete an application of insurance for Cambridge, accepting any money from Mr. Strickland as a down payment for insurance with Cambridge, or issuing Mr. Strickland a binder for insurance with Cambridge. Further, Ms. Emery communicated, and Mr. Strickland understood, that the prospect of insuring the Property *106 was based on the fulfillment of two conditions: providing up-to-date pictures and completing the woodstove questionnaire. Those conditions were not satisfied in full until December 6, when Mrs. Strickland delivered the woodstove questionnaire to Cross. The record also indicates that an implied contract of insurance did not arise on December 6, because Ms. Emery expressly told Mrs. Strickland that it would be necessary for Mr. Strickland to sign the documents before the insurance could be obtained. Finally, Mr. Strickland did not cancel his Patrons Oxford insurance policy on December 3 or 6, but rather on December 9.
In this case, the record demonstrates that the insureds certainly did not think they had secured a dwelling fire policy until December 9, when they entered into an express contract with Acadia. Moreover, the actions of the agents at Cross show without dispute that they did not believe that any contract for dwelling fire insurance had been created on December 3 or 6. In the absence of any evidence to support a conclusion that there was a meeting of minds between Cross and the Stricklands on the question of whether the Stricklands were actually insured by Cambridge prior to December 9, the record does not permit this Court to imply the existence of a contract.
The Court will grant Cambridge's claim for summary judgment against Patriot for equitable subrogation and will deny Patriot's Motion for Summary Judgment against Cambridge on its claims for equitable subrogation and reformation. In addition, the Court will grant Cambridge's Motion for Summary Judgment on Cross's cross-claims against Cambridge for breach of implied contract and mutual mistake.

B. Patriot's Third-Party Claims
Patriot has brought Third-Party claims against Cross for negligence (Count I), breach of agency agreement (Count II), indemnity (Count III), breach of fiduciary duty (Count IV), and contribution and indemnity (Count V). In its Motion for Summary Judgment, Patriot raises only its claims for breach of agency agreement (Count II) and breach of fiduciary duty (Count IV). With respect to Patriot's claims for negligence and indemnity and contribution, Cross responds by noting that Patriot failed to make any specific arguments in its motion on these claims. In its reply memorandum, Patriot points to factual evidence in its original motion that, Patriot argues, supports its negligence claim. This Court will not consider arguments first presented in a reply memorandum. See In re One Bancorp Sec. Litig., 134 F.R.D. 4, 10 n. 5 (D.Me.1991). By failing to draw attention to the facts that support these claims and put forth any legal arguments supporting these claims in its original memorandum, Patriot has deprived Cross of the ability to make cogent arguments to counter its motion for summary judgment. The Court will, therefore, deny Patriot's Motion for Summary Judgment on its claims for negligence (Count I), indemnity (Count III) and contribution and indemnity (Count V).[13]
With respect to its third-party claim for breach of agency agreement, Patriot contends that because Cross had no authority to bind Acadia to the Strickland Property, Cross breached its agency agreement with Acadia. Cross responds by arguing that Patriot has failed to produce any evidence that Cross breached its agency agreement with Patriot and that the issue of whether Cross may have breached its agency agreement with Acadia *107 has not been properly pled in the Third-Party Complaint. Patriot believes that the language contained in the "Stipulation of Dismissal Without Prejudice" wherein the parties agreed to dismiss Acadia from this suit, provides that Patriot stands in the shoes of Acadia as to both obligations and rights, so it does not matter whether Cross breached its duties to Acadia, to Patriot, or to both. The Court disagrees with Patriot.
The stipulation relied upon by Patriot provides that "if Acadia was legally obligated to provide insurance coverage to the Stricklands, then Patriot is obligated to pay the Stricklands to the same extent that Acadia would have been." Stipulation of Dismissal Without Prejudice ¶ 3. This provision of the Stipulation of Dismissal simply states that Patriot will pay if Acadia is obligated. It does not pronounce that Patriot has the right to sue on Acadia's claims. Cross bound Acadia, not Patriot, to the temporary contract of insurance with the Stricklands. After reviewing the entire Stipulation of Dismissal agreement, the Court concludes that it contains no assignment-type provision that would permit Patriot to bring a claim of Acadia's on its own behalf. Although Patriot and Acadia had an agreement whereby Patriot would take over Acadia's personal lines, the record does not provide any basis upon which Acadia authorized Patriot to sue on its rights or claims. The Court will, therefore, deny Patriot's Motion for Summary Judgment on its third-party claim for breach of agency agreement.
Although not altogether clear, it seems that Patriot asserts two arguments to support its breach of fiduciary duty claim. First, Patriot contends that Cross breached the fiduciary duty it owed to Patriot by acting beyond its authority to bind Acadia. Patriot also asserts that Cross breached its fiduciary duty to both Acadia and Patriot when it breached its agency agreements because both the Acadia and Patriot agreements required that the agent call the underwriting department before binding coverage. Like Patriot's claim for breach of agency agreement, Patriot's claim for breach of fiduciary duty appears to be Acadia's to bring. Here again, Cross bound Acadia, not Patriot. The Court finds no basis in this record to support a finding that Acadia has assigned to Patriot its right to recover on its claims against Cross. The Court will, therefore, deny Patriot's Motion for Summary Judgment on its third-party claim for breach of fiduciary duty.
Finally, on this factual record, the Court will deny Patriot's Motion for Summary Judgment on Cross's counterclaims for breach of contract and equitable subrogation.

III. CONCLUSION
Accordingly, it is ORDERED that Cambridge's Motion for Summary Judgment against Patriot be, and it is hereby, GRANTED on its claim for equitable subrogation (Count III) and it is ORDERED that Patriot pay Cambridge Eighty Thousand Eight Dollars and Seventy-Six Cents ($80,008.76) plus interest. It is further ORDERED that Cambridge's Motion for Summary Judgment against Cross's cross-claims for breach of contract (Count I) and mutual mistake (Count II) be, and it is hereby, GRANTED.
It is further ORDERED that Patriot's Motion for Summary Judgment against Cambridge be, and it is hereby, DENIED on its claims for equitable subrogation (Count I) and reformation (Count II). It is further ORDERED that Patriot's Motion for Summary Judgment against Cross on its Third-Party claims be, and it is hereby DENIED. Finally, it is ORDERED that Patriot's Motion for Summary *108 Judgment on Cross's Counterclaims for breach of contract (Count I) and equitable subrogation (Count II) be, and it is hereby, DENIED.
The claims that remain for trial are Patriot's third-party claims against Cross for negligence (Count I), breach of agency agreement (Count II), indemnity (Count III), breach of fiduciary duty (Count IV), and contribution and indemnity (Count V) as well as Cross's counterclaims against Patriot for breach of contract (Count I) and equitable subrogation (Count II).
NOTES
[1] Initially, Cambridge also brought this action against Acadia Insurance Company for breach of contract (Count I) and equitable subrogation (Count II). In August 2003, the parties filed a "Stipulation of Dismissal Without Prejudice" wherein the parties agreed to dismiss Acadia. See Docket Item No. 22.
[2] The agency agreement between Cross and Cambridge remains in effect, and Cross remains an authorized agent of Cambridge. Cross Aff. ¶ 5.
[3] The agency agreement between Cross and Patriot remains in effect, and Cross remains an authorized agent of Patriot. Cross Aff. ¶ 8.
[4] In addition to the November 25, 2002, letter, Cross received a Personal Lines Agent Bulletin from Acadia on November 21, 2002. Bloom Aff. ¶ 4.
[5] Mr. Cross did not communicate the transition of personal lines business from Acadia to Patriot to his agents because he was told not to disclose that information. Deposition of Royce Cross at 84-85.
[6] For the purposes of this opinion, the Court will refer to "Cambridge" to designate either the Andover Companies or the Cambridge Mutual Insurance Company.
[7] Mr. Strickland and his wife had never purchased any insurance from the Andover Companies or Cambridge Mutual prior to December 2002. Mr. Strickland Aff. ¶ 10; Affidavit of Kathleen Strickland ¶¶ 4-5; Emery Dep. at 104.
[8] Laurene Rich was, and still is, a licensed agent of Cambridge and Acadia. Rich Dep. at 5, 129.
[9] The application and binder that Mr. Strickland and Ms. Rich completed on December 9, 2002, were Acord forms into which Ms. Rich entered information  including the name of the insurance company  on the computer. Rich Dep. at 116-17, 121-24, 127; Mr. Strickland Aff. ¶ 7 and Exhibit B to Mr. Strickland's Affidavit.
[10] On various documents in the record, Kathleen Strickland is referred to as Kathleen Thompson. See Release and Assignment of Claims attached to Complaint as Ex.G.
[11] Restatement of Restitution § 162 (1937) provides:

Where Property of one person is used in discharging an obligation owed by another ... under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.
[12] "Policy" is defined in the Maine Insurance Code as "the written contract of or written agreement for or effecting insurance, by whatever name called, and includes all clauses, riders, endorsements and papers which are a part thereof." 24-A M.R.S.A. § 2402. Therefore, the binder issued by Cross to the Stricklands satisfies the statutory definition of a "policy."
[13] The Court notes that Patriot's third-party claims for contribution and indemnity are remedial in nature and as such do not form the basis for a separate claim.