STATE OF MAINE

Cumberland, ss

BUSINESS AND CONSUMER COURT

Location: Portland
Docket No.: BCD-CV-11-03
AMH - CuM - 11/14/2011

415 CONGRESS STREET
PROPERTIES, LP, and
HARPERS DEVELOPMENT, LLC,

      Plaintiffs,

    v.

URS GROUP, INC., URS
CORPORATION, and T.F.
PROPERTIES, INC.,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER ON DEFENDANTS URS GROUP INC. AND URS CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Defendants URS Group, Inc. (URS Group) and URS Corporation (URS Corp.) (collectively, the "URS Defendants") have moved for summary judgment on Counts I, II, and III of Plaintiffs Harpers Development, LLC (Harpers) and 415 Congress Street Properties, LP's (415 Congress) complaint. For the reasons stated within, the court grants the motion in part and denies the motion in part.

### BACKGROUND

The following facts are undisputed, except where noted. This case arises out of a Property Condition Assessment ("PCA") performed by URS Corp. for Harpers on a building located at 415 Congress Street in Portland, Maine ("the building"). (Defs.' Supp. S.M.F. ¶ 1; Pl.'s Opp. S.M.F. ¶ 1.) URS Corp. provides, among other things, professional architecture and engineering services to its clients. (Defs.' Supp. S.M.F. ¶ 7; Pl.'s Opp. S.M.F. ¶ 7.) Harpers is

a leading, experienced real estate developer in the State of Maine. (Defs.' Supp. S.M.F. ¶ 2; Pl.'s Opp. S.M.F. ¶ 2.) 415 Congress is a Maine limited partnership formed on September 21, 2004. (S.M.F. ¶ 3.) Harpers has no ownership interest in 415 Congress; they are entirely separate entities. (Defs.' Supp. S.M.F. ¶ 6; Pl.'s Opp. S.M.F. ¶ 6.) Defendant T.F. Properties, Inc. (T.F. Properties) sold the building to 415 Congress. (Defs.' Supp. S.M.F. ¶ 9; Pl.'s Opp. S.M.F. ¶ 9.)

On March 5, 2004, Harpers contracted with Defendant T.F. Properties, Inc. (T.F. Properties) to purchase the building, and later they entered into a Reinstatement of a First Amendment to the Purchase and Sale Agreement. (Defs.' Supp. S.M.F. ¶¶ 20, 25; Pl.'s Opp. S.M.F. ¶¶ 20, 25.) In November 2004, Harpers assigned all of its "right, title and interest in and to any and all architectural plans, engineering work, [and] inspection reports" acquired by Harpers "in connection with the acquisition or development of" the building to 415 Congress, "together with any and all rights and claims relating thereto." (Pl.'s A.S.M.F. ¶ 12.)[1] Defs.' Supp. S.M.F. ¶ 20; Pl.'s Opp. S.M.F. ¶ 20.) T.F. Properties then sold the building to 415 Congress on November 22, 2004. (Defs.' Supp. S.M.F. ¶ 9; Pl.'s Opp. S.M.F. ¶ 9.)

URS Corp. and Harpers entered into an "Agreement for Professional Services" (the "Agreement") on February 5, 2004. (Defs.' Supp. S.M.F. ¶ 15; Pl.'s Opp. S.M.F. ¶ 15.) The Agreement contains provisions entitled "Risk Allocation," "No Consequential Damages," "No Third Party Rights," and "No Assignment," and the parties do not dispute the content of these provisions. (Defs.' Supp. S.M.F. ¶¶ 16-19; Pl.'s Opp. S.M.F. ¶¶ 16-19.) The Agreement contemplates that the scope of services it covers will be set forth in separate written work orders. (Defs.' Ex. 4, Art. I.) The parties dispute whether Harpers hired URS Corp. to perform

---

[1] The URS Defendants both deny and object to this statement of material fact. The URS Defendants' denial is really however, more in the nature of a qualification than an outright denial. The URS Defendants point out that the Agreement for Professional Serviced executed between Harpers and URS Corp. prohibits any party from relying on the PCA unless URS gives its consent, but does not challenge the purported assignment. (Defs.' Reply

a "professional" PCA, but do not dispute that at least one of the URS Defendants did in fact conduct the PCA.[2] (Defs.' Supp. S.M.F. ¶ 8; Pl.'s Opp. S.M.F. ¶ 8.) The work order to perform the PCA on the building was executed on October 4, 2004, between Harpers and URS Corp. (Defs.' Supp. S.M.F. ¶ 34; Pl.'s Opp. S.M.F. ¶ 34.)

URS Corp. performed a site visit of the building on October 13, 2004. (Defs.' Supp. S.M.F. ¶ 36; Pl.'s Opp. S.M.F. ¶ 36.)[3] Tony DiNicola, an architect, performed the PCA. (Defs.' Supp. S.M.F. ¶ 37; Pl.'s Opp. S.M.F. ¶ 37.) DiNicola has never been licensed to practice architecture in Maine. (Pls.' A.S.M.F. ¶ 5; Defs.' Reply S.M.F. ¶ 5.) URS Corp. completed a draft PCA on October 19, 2004. (Defs.' Supp. S.M.F. ¶ 45; Pl.'s Opp. S.M.F. ¶ 45.) URS Corp. delivered the draft PCA via e-mail to Harpers on October 20, 2004. (Defs.' Supp. S.M.F. ¶ 46; Pl.'s Opp. S.M.F. ¶ 46.) Harpers reviewed the report and informed URS Corp.: "This looks very good! It is ready to print." (Defs.' Supp. S.M.F. ¶ 47; Pl.'s Opp. S.M.F. ¶ 47.) URS Corp. corrected several typos in the report and sent a clean, final copy to Harpers on October 28, 2004. (Defs.' Supp. S.M.F. ¶ 50; Pl.'s Opp. S.M.F. ¶ 50.)

The PCA's statement of the condition of the façade of the building forms the basis of Plaintiffs' claims against the URS Defendants. (*See* Compl. ¶ 24; Defs.' Supp. S.M.F. ¶ 70; Pl.'s Opp. S.M.F. ¶ 70.) In their statements of material facts, Plaintiffs and URS Defendants cite to different exhibits for the language of the report regarding the façade. The URS Defendants cite to the draft, dated October 19, 2004, and sent to the Plaintiffs on October 20, 2004;

---

[2] There is some dispute as to what party was in fact hired. (*See* Defs.' Supp. S.M.F. ¶¶ 8, 10-12; Pls.' Opp. S.M.F. ¶¶ 8, 10-12.) The URS Defendants asserts that URS Group and URS Corp. are separate and distinct entities. (Defs.' Supp. S.M.F. ¶ 10.) The URS Defendants also claim that URS Group had no involvement in any transaction or occurrence that is the subject of the plaintiffs' complaint. (Defs.' Supp. S.M.F. ¶ 11.) Accordingly, the URS Defendants contend that there is no contract between either plaintiff and URS Group. (Defs.' Supp. S.M.F. ¶ 12.) Plaintiffs aver that there is no record evidence to support separate corporate entities, and the record evidence suggests Plaintiffs were doing business with URS Group. (Pls.' Opp. S.M.F. ¶¶ 10-12.)

[3] The URS Defendants state that they "performed the PCA on October 13, 2004," but Plaintiffs properly deny the statement and point out that the record citations only support that the site visit or inspection occurred that day. (Defs.' Supp. S.M.F. ¶ 36; Pls.' Opp. S.M.F. ¶ 36.)

Plaintiffs cite to the final report, dated and sent on October 28 2004. (*See* Defs.' Supp. S.M.F. ¶¶ 53-55; Pl.'s Opp. S.M.F. ¶ 53-55.) The parties do not dispute, however, the content of the PCA regarding the façade, which is identical in both versions:

- "There are several places in the masonry façade where repointing of mortar joints or minor repairs need to be made, including a vertical crack in the pilaster at the northeast corner of the building. This repair work needs to be carried out in the short term, to prevent additional water intrusion and freeze/thaw action." (Defs.' Exh. 14 at 1-4; Defs.' Exh. 15 at 1-4.)

- "The copper flashing at the top side of the major ledge/cornice is in poor condition. This has already been replaced at the northeast corner of the building, along with repointing of mortar joints and replacement of sealant joints, motivated by water intrusion at the fifth floor level wetting and damaging the plaster interior finish. Also, some of the limestone detailing on the underside of this ledge/cornice has deteriorated due to freeze/thaw action. While restoration of the deteriorated limestone is a cosmetic issue, the work started on the northeast corner needs to continue, to include replacement of the copper flashing and repointing/replacement of deteriorated mortar and sealant joints at all the rest of this major ledge/cornice, in order to arrest further limestone deterioration." (Defs.' Exh. 14 at 1-4; Defs.' Exh. 15 at 1-4.)

- "There is some deterioration of the top of the stone medallion at the center of the Congress Street façade. This needs to be repaired." (Defs.' Exh. 14 at 1-5; Defs.' Exh. 15 at 1-5.)

(*See* Defs.' Supp. S.M.F. ¶¶ 53-55; Pl.'s Opp. S.M.F. ¶ 53-55.) The façade defects claimed by Plaintiffs in this action relate to the terra cotta exterior of the building, which includes the areas around the windows and at the building's cornices and ledges. (Defs.' Supp. S.M.F. ¶ 70; Pl.'s Opp. S.M.F. ¶ 70.) 415 Congress continued to experience water infiltration problems related to the façade after it acquired the building and throughout 2005. (Defs.' Supp. S.M.F. ¶ 72; Pl.'s Opp. S.M.F. ¶ 72.) In March 2006, a piece of the terra cotta ledge/cornice area fell to the street below as a result of water penetration into the terra cotta that experienced freeze/thaw cycles. (Defs.' Supp. S.M.F. ¶¶ 73, 77; Pl.'s Opp. S.M.F. ¶¶ 73, 77.)

Harpers and 415 Congress initiated this litigation by filing a seven-count complaint in Cumberland County Superior Court on October 21, 2010. Three counts were brought against

4

URS Group: 1) breach of contract (Count I), 2) negligence (Count II), and 3) unjust enrichment (Count III). The case was transferred to the Business and Consumer Court on January 26, 2011. Plaintiffs filed an amended complaint adding URS Corp. as a defendant on April 13, 2011, as to Counts I, II, and III. The court held oral argument on Defendants' motion on November 1, 2011.

## ANALYSIS

Summary judgment is proper where there exist no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781 (quotations omitted). A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 22. A party wishing to avoid summary judgment must present a prima facie case for the claim or defense that is asserted. *Reliance Nat'l Indem. v. Knowles Indus. Svcs.*, 2005 ME 29, ¶ 9, 868 A.2d 220, 224-25. At this stage, the facts are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63, 65.

I.      Statute of Limitations

The URS Defendants contend that the claims against them are time barred by both the general and the design professional statute of limitations. Plaintiffs counter that the shorter four-year statute of limitations for design professionals does not apply because neither URS nor DiNicola is a registered architect in Maine. Plaintiffs also contend that they have met the six-year general statute of limitations and their action is not time-barred.

A.    Design Professional Statute of Limitations

The statute of limitations for design professionals states that "[a]ll civil actions for malpractice or professional negligence against architects or engineers duly licensed or registered under Title 32 shall be commenced within 4 years after such malpractice or negligence is discovered . . . ." 14 M.R.S. § 752-A (2010). Title 32 M.R.S. § 220(1) (2010) prohibits architects from practicing within the state "unless the person is duly licensed by the board." The practice of architecture is defined as:

> rendering or offering to render service to clients by consultations, investigations, technical submissions and a coordination of structural factors concerning the aesthetic or structural design and administration of construction contracts or any other service in connection with the designing or administration of construction contracts for buildings located inside the State that have as their principal purpose human occupancy or habitation.

*Id.* The four-year statute of limitations with section 752-A only applies to professional negligence claims against architects registered within the state. Because Mr. DiNicola admittedly has never been a licensed architect in Maine (Defs.' Reply S.M.F. ¶ 5), the statute of limitations for design professionals does not apply.

B.    General Statute of Limitations

According to the general statute of limitations, "[a]ll civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, . . . except as otherwise specially provided." 14 M.R.S. § 752. A "year" means a calendar year. *Tesseo v. Brown*, 1998 ME 155, ¶ 6, 712 A.2d 1059, 1060. "The general test for determining when a cause of action accrues is when a plaintiff 'received a judicially recognizable injury.'" *Johnston v. Dow & Coulombe*, 686 A.2d 1064, 1065-66 (Me. 1996) (quoting *Bozzuto v. Ouellette*, 408 A.2d 697, 699 (Me. 1979) (citation omitted)). In a breach of contract action, the cause of action accrues at the date of the breach. *Gile v. Albert*, 2008 ME 58, ¶ 8, 943 A.2d 599, 601. "'[A] cause of action

6

sounding in tort accrues when the plaintiff sustains harm to a protected interest.'" *Johnston,* 686 A.2d at 1066 (quoting *Chiapetta v. Clark Assocs.,* 521 A.2d 697, 699 (Me. 1987)).

The URS Defendants argue that the test for accrual of Plaintiffs' cause of action should be when the property assessment was performed, i.e. on October 13, 2004, relying on *Johnston v. Dow & Coulombe,* 686 A.2d 1064 (Me. 1996). In *Johnston,* the plaintiffs alleged that a surveying firm negligently prepared a surveying plan. *Id.* at 1065. The plaintiffs claimed that their cause of action did not accrue until abutting landowners succeeded in a quiet title action against them. *Id.* at 1065. The Law Court disagreed and held that the plaintiffs "suffered an injury at the time of the performance of the survey, and the statute of limitations began to run at that time."[4] *Id.* at 1066. What *Johnston* indicates for this case is simply that the statute of limitations began running, not when either or both Plaintiffs discovered the asserted deficiencies in the PCA, but when the PCA was rendered.

In this case, the URS Defendants performed the site visit for the PCA on October 13, 2004, outside the six-year period, but did not finalize and render the resulting report until October 28, 2004, within the six-year limitations period. Because a cause of action accrues in contract on the date of the breach, it is clear that the breach, if any, would have occurred when the URS Defendants submitted the finalized report. Likewise, the breach of duty of care alleged in the Plaintiffs' negligence claim cannot have occurred before the date on which the finalized PCA report was presented to Harpers—how the assessment was conducted on October 13 obviously influenced the content of the final PCA report, but the asserted negligence consists of the alleged deficiencies in the final report.

---

[4] The Law Court also addressed the statute of limitation for land surveyors and stated that: "We have never held that the date of discovery triggered the running of the statute of limitations in an action for the alleged negligence of surveyors and decline to do so in this case." *Johnston v. Dow & Coulombe,* 686 A.2d 1064, 1067 (Me. 1996). The Court refused to expand the discovery rule in the case of land surveyors. *Id.* at 1066.

Accrual of all three claims, on October 28, 2004, falls within the general statute of limitations and thus is not time barred.

II.     Claims Against URS Group

The URS Defendants assert that URS Group is a stranger to these transactions and summary judgment should be granted in URS Group's favor. Plaintiffs assert that there is an issue of material fact as to whether URS Group was involved in these transactions and claim they need time for more discovery to uncover URS Group's relationship to URS Corp. and to what extent URS Group was involved in the transaction at issue.

Plaintiffs are suing the URS Defendants for an allegedly inaccurate and incomplete PCA.[5] (Amend. Compl. ¶¶ 20, 24.) Thus, the contract at issue is the contract for the PCA, which was executed between Harpers and URS Corp. Plaintiffs admit that there was no written agreement between Harpers and URS Group, but deny that there was no agreement between the two, seemingly implying that there is an oral agreement between Harpers and URS Group. (Pl.'s Opp. S.M.F. ¶ 12.) In support, Plaintiffs cite to two documents in the record: the cover letter to the final draft of the PCA, and the invoice for the PCA sent to Harpers. (Defs.' Exh. 15 at 2; Defs.' Exh. 22 at 9.) The cover letter, signed by DiNicola, was attached to the final draft of the PCA that URS sent to Harpers. The cover letter is signed by URS Corporation and DiNicola, but the cover letter is on the letterhead of URS Group. (Defs.' Exh. 15 at 2.) The invoice for the PCA does not identify whether the invoice is from URS Corp. or URS Group; it just has "URS" in the upper corner of the page. (Defs.' Exh. 22 at 9.) At the bottom of the invoice, however, is contact information for "Harley A. Morgan at 207 879-7686 or via email at Harley_Morgan@urscorp.com" for any questions regarding the bill."

---

[5] Plaintiffs suggest that the work order/contract for the PCA is not governed by the Agreement between Harper and URS Corp. (Pls.' Opp'n MSJ 9), but that suggestion is unavailing. The work order for the PCA plainly states that it is "[i]n accordance with the Agreement for Professional Services between [Harpers] and [URS Corp.] . . . dated February 5, 2004." (Defs.' Exh. 9 at 1.)

(Defs.' Exh. 22 at 9.) Plaintiffs' statements of material facts do not address an oral contract between URS Group and Harpers or between URS Group and 415 Congress, and Plaintiffs admit that URS Group received no payment from Harpers or 415 Congress in connection with these transactions. (Defs.' Supp. S.M.F. ¶ 14; Pls.' Opp. S.M.F. ¶ 14.)

Based on the record evidence cited by Plaintiffs, even when viewed in the light most favorable to them, Plaintiffs have not generated an issue of material fact as to whom Plaintiffs contracted with for the PCA. The written agreements for the professional services and the work order are between Harpers and URS Corp.; URS Group received no payment for the PCA; and other than the unsupported suggestion of an oral agreement between URS Group and Harpers, Plaintiffs' statements of material facts do not address or support any such agreement and summary judgment on Count I in favor of URS Group is warranted. Further, because the negligence asserted is the negligence in the performance of the PCA, summary judgment in favor of URS Group on Count II also is appropriate.

Finally, in Count III, Plaintiffs allege that they 1) conferred a benefit upon the URS Defendants in the form of payment of money 2) with the URS Defendants' knowledge, 3) the URS Defendants accepted and retained the benefit received form Plaintiffs under such circumstances as to make it inequitable for URS to retain it without having given consideration of equal value in exchange, and 4) as a result, the Plaintiffs have suffered pecuniary harm. (Amend. Compl. ¶¶ 33-36.)

On this count, summary judgment is appropriate in favor of URS Group because Plaintiffs admit that URS Group received no payment from either 415 Congress or Harpers in connection with the building. (Defs.' Supp. S.M.F. ¶ 14; Pl's Opp. S.M.F. ¶ 14.) Because the only benefit that Plaintiffs claim they conferred on the Defendants is payment of money, the

9

admission of no payment to URS Group is fatal to their unjust enrichment claim and summary judgment in URS Group's favor is appropriate.

As discussed at oral argument on this motion, the court will grant summary judgment in favor of URS Group because Plaintiffs have not generated an issue of material fact as to their involvement. URS Group's dismissal from the suit is without prejudice, and Plaintiffs are free to inquire during discovery as to the direct involvement of URS Group in the PCA. If Plaintiffs develop a basis—equating to a prima facie case against URS Group, *see Reliance Na'l Indem. v. Knowles Indus. Svcs., supra*, 2005 ME 29 at¶ 9, 868 A.2d at 224-25 —they may move for an order revising this Order and reinstating the claims against URS Group. *See* M.R. Civ. P. 54(b)(1) (non-final order adjudicating claims is subject to revision at any time before entry of final judgment).

## III. Claims Against URS Corp.

### A. Counts I and II – Breach of Contract and Negligence

As noted, Plaintiffs are suing the URS Defendants for an allegedly inaccurate and incomplete PCA. (Amend. Compl. ¶¶ 20, 24.) 415 Congress is not a named party to the PCA, but Harpers transferred to 415 Congress all of its "right, title and interest in an to any and all architectural plans, engineering work, inspection reports" acquired by Harpers in connection with the acquisition or development of" the building "together with any and all rights and claims relating thereto" in November 2004. (Pls.' A.S.M.F. ¶ 12; Defs.' Reply S.M.F. ¶ 12.) Defendants contend that the assignment of rights from Harpers to 415 Congress was ineffective because the Agreement between URS Corp. and Harpers prohibits assignment and third-party beneficiaries. (Defs.' MSJ 10-11.) Plaintiffs counter that these provisions only prevent the assignment of duties or obligations, not the assignment of rights. (Pls.' Opp'n MSJ 10-13; Pls.' A.S.M.F. ¶ 12.)

10

"An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317(1) (1981). Maine law recognizes the assignment of contractual rights as permissible, "unless the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract." *Chadwick-BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711, 715 (Me. 1984) (quoting Restatement (Second) of Contracts § 317(2)(a)).

The provisions of the Agreement upon which Defendants rely to challenge the assignment of rights are as follows:

> **ARTICLE XIII – <u>No Third Party Rights</u>.** This Agreement shall not create any rights or benefits to parties other than Client and URS. No third party shall have the right to rely on URS opinions rendered in connection with the Services without the written consent of URS and the third party's agreement to be bound to the same conditions and limitations as Client.

> **ARTICLE XIV – <u>Assignments</u>.** Neither party to this Agreement shall assign its duties and obligations hereunder without the prior written consent of the other party.

(Defs.' Supp. S.M.F. ¶¶ 18-19; Pls.' Opp. S.M.F. ¶¶ 18-19.) Based on these two provisions, Defendants argue the intention of the parties was to prevent any other party from relying on the PCA or gaining any rights in the contract. Plaintiffs counter that the assignment of rights and claims allowed 415 Congress to step into the shoes of Harpers, and that 415 Congress is now the party to the contract.

On its face, the assignment provision at Article XIV applies only to assignments of duties and obligations, and does not prohibit an assignment of rights. Similarly, on its face, Article XIII says that the Agreement, presumably in and of itself standing alone, does not create any rights in third parties—it therefore is silent on the effect of an assignment of rights.

11

The court views both provisions as ambiguous at least and also is cognizant of Plaintiffs' argument that both provisions should be construed against URS Corp. as the drafter. Thus, the court declines to grant summary judgment to URS Corp based on the two provisions.

As to the merits of the breach of contract claims and the negligence claims as asserted by 415 Congress and Harpers against URS Corp, issues of fact preclude awarding summary judgment.

B.      Count III – Unjust Enrichment

In their Amended Complaint, Plaintiffs allege that they 1) conferred a benefit upon the URS Defendants in the amount of the fee paid to URS Corp. for the PCA 2) with the URS Defendants' knowledge, 3) the URS Defendants accepted and retained the benefit received form Plaintiffs under such circumstances as to make it inequitable for URS to retain it without having given consideration of equal value in exchange, and 4) as a result, the Plaintiffs have suffered pecuniary harm. (Amend. Compl. ¶¶ 33-36.) With regards to the unjust enrichment claim brought by Plaintiffs against URS Corp., the Law Court has said:

> The remedy of "unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271. The existence of a contractual relationship, "precludes recovery on a theory of unjust enrichment." *June Roberts Agency, Inc. v. Venture Properties, Inc.*, 676 A.2d 46, 49 n.1 (Me. 1996).

*Nadeau v. Pitman*, 1999 ME 104, ¶ 14, 731 A.2d 863, 866-67. Thus, the contract between Harpers and URS Corp. precludes Harpers from recovering on an unjust enrichment theory, and summary judgment in their favor is appropriate. *See id.* Further, because 415 Congress's breach of contract claim is in essence Harpers' breach of contract claim, 415 Congress also is precluded from proceeding on an unjust enrichment theory.

12

IV.     Damages

Lastly, Defendants argue that should any count of Plaintiffs' complaint survive the motion for summary judgment, any recovery should be limited to those laid out in the Agreement. (Defs.' MSJ 17-19.) The Agreement contains the following risk allocation and consequential damages clauses:

> **ARTICLE V – Risk Allocation.** The liability of URS, its employees, agents and subcontractors (referred collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:
>
> (1)     The total sum of $250,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract . . .
>
> (2)     The total sum of $1,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above).
>
> . . . .
>
> **ARTICLE VII – Consequential Damages.** Neither Party shall be liable to the other for consequential damages, including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such damages are caused by breach of contract, willful misconduct, negligent act or omission, or other wrongful act of either of them.

(Defs.' Supp. S.M.F. ¶¶ 16-17; Pls.' Opp. S.M.F. ¶¶ 16-17.)

It seems likely that the $250,000 cap applies, but because there are issues as to whether URS Corp. rendered "professional services" or committed an "unintentional breach of contract," summary judgment on the effect of the dollar caps is premature.

Likewise, the provision precluding consequential damages is enforceable, but because the Plaintiffs' claimed losses may include the value of physical deterioration or damage, which

13

likely would be deemed direct damages in the context of this case, Defendant URS Corp. has not shown it is entitled to summary judgment on damages against Plaintiff 415 at least.

Further, Defendants have argued that the economic loss doctrine bars Plaintiffs from recovering in tort for purely economic losses. The economic loss doctrine is customarily applied in the products liability context, but even assuming it applies here, the facts do not necessarily support it. Physical damage or loss usually renders the economic loss doctrine inapplicable even where it would otherwise apply. 415 Congress claims losses from the further physical damage or deterioration that it says would not have occurred but for URS Corp.'s negligence, and Defendant URS Corp. has not shown it is entitled to summary judgment on that ground.

However, Harpers has quite clearly not suffered any loss—at least not yet—as a result of anything URS Corp. did or did not do in connection with the PCA. At oral argument, Harpers' counsel explained that Harpers has joined as a co-plaintiff with 415 Congress because Harpers may be liable to 415 Congress if Harpers' assignment of its rights under the PCA to 415 Congress does not stand up. This does not equate to any existing affirmative claim by Harpers—the only cognizable claim Harpers would have, even if it is found liable to 415 Congress for making an invalid assignment, might be a contribution/indemnification claim against URS Corp. Thus, Defendant URS Corp. will be granted summary judgment on Harpers' damages claims against it based on the absence of any damage or loss to Harper as a result of the PCA.

## CONCLUSION

Based on the foregoing, it is hereby ordered as follows:

1. Defendant URS Group's Motion for Summary Judgment is GRANTED against both Plaintiffs on Counts I, II, and III, subject to possible reinstatement as indicated above.

14

2. Defendant URS Corp.'s Motion for Summary judgment is GRANTED as to all claims by Plaintiff Harpers Development and is also granted as to Plaintiff 415 Congress Street with respect to Count III.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this Order and Judgment by incorporation in the docket.

Dated November 10, 2011

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 11-14-11
Copies sent via Mail ___ Electronically ___

15

415 Congress Street Properties, LP et al v. URS Group, Inc. et al
BCD-CV-2011-03

*Counsel of Record*

| Attorney Name | Party Name |
|---|---|
| Timothy Bryant, Esq. | 415 Congress Street Properties, LP |
| Thomas McKeon, Esq. | Harpers Development, LLC |
| Brett Leland, Esq.<br>Daren Garcia, Esq.<br>William Porter, Esq. | URS Group, Inc. and URS Corp.<br>"            "<br>"            " |
| Leslie Lowry, Esq. | T.F. Properties, Inc. |

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-11-09
*AM* -CUM- 7/30/2012

415 CONGRESS STREET
PROPERTIES, LP, and
HARPERS DEVELOPMENT, LLC,

        Plaintiffs,

    v.

URS CORPORATION and T.F.
PROPERTIES, INC.,

        Defendants

    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )

## ORDER ON DEFENDANT URS CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant URS Corporation (URS Corp.) has filed a Motion for Summary Judgment, or, in the Alternative, Motion *in Limine* for an Order Enforcing the $250,000 Contractual Damages Cap. Plaintiffs oppose the motion. The court elects to decide the motion without oral argument, *see* M.R. Civ. P. 7(b)(7); Case Management Conference Scheduling Order No. 1 ¶ 10. For the reasons stated within, the court grants the motion for summary judgment.

### BACKGROUND

The following facts are undisputed, except where noted.

This case arises from a Property Condition Assessment (PCA) performed by URS Corp. for Plaintiff Harpers Development, LLC (Harpers) on a multi-story office building located at 415 Congress Street in Portland, Maine (the "Building"). (Supp. S.M.F. ¶ 1; Opp. S.M.F. ¶ 1.) Harpers is an experienced real estate developer in Maine, engaging in sophisticated

development deals throughout the state, and in the past has purchased buildings of the same age as the Building. (Supp. S.M.F. ¶2; Opp. S.M.F. ¶2.)

URS Corp. and Harpers entered into an agreement effective February 5, 2004, entitled "Agreement for Professional Services," (the "Agreement") which referenced one or more "Work Orders" to which the Agreement's terms and conditions would apply. (Supp. S.M.F. ¶¶6, 8; Opp. S.M.F. ¶¶6, 8; *see* A.S.M.F. ¶8.) The Agreement contains a "Risk Allocation" provision:

> **ARTICLE V – Risk Allocation.** The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:
>
> (1)     The total sum of $250,000 for claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract . . .
>
> (2)     The total sum of $1,000,000 for claims arising out of negligence, breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

(Supp. S.M.F. ¶7; Opp. S.M.F. ¶7.)

On October 4, 2004, Harpers and URS Corp. executed a work order for the PCA on the Building, which stated that "[t]he terms and conditions of the [Agreement] shall apply to this Work Order, except as expressly modified herein." (Supp. S.M.F. ¶¶9-11; Opp. S.M.F. ¶¶9-11; Mattson Depo. Exh. 9.) URS Corp. assigned its employee, Tony DiNicola, to perform the PCA. Mr. DiNicola is a registered architect, but he was not practicing architecture in connection with the PCA. (Supp. S.M.F. ¶12; Opp. S.M.F. ¶12; A.S.M.F. ¶11; Reply S.M.F. ¶11.) The parties disagree about whether URS Corp. was directed to conduct the PCA

2

pursuant to ASTM standards[1], and what entity may have directed URS Corp. to do so, but there is no dispute that Mr. DiNicola utilized ASTM standards in conducting the PCA. (Supp. S.M.F. ¶15; Opp. S.M.F. ¶5; Mattson Depo. Exh. 15 at 2-2.) The results of the PCA were presented to Harpers in October 2004 in a 73-page PCA report (the "Report"). (Supp. S.M.F. ¶13; Opp. S.M.F. ¶13.) URS Corp. billed Harpers a total of $2,086.44 for the PCA and Report. (Supp. S.M.F. ¶14.)[2]

In November 2004, Harpers assigned all of its "right, title and interest in and to any and all architectural plans, engineering work, [and] inspection reports" acquired by Harpers "in connection with the acquisition or development of" the building to Plaintiff 415 Congress Street Properties, L.P., a Maine limited partnership formed on September 21, 2004 for the purpose of owning and operating the Building, "together with any and all rights and claims relating thereto." (Supp. S.M.F. ¶3, 4; Opp. S.M.F. ¶3, 4.)[3]

The PCA's assessment of the condition of the façade of the Building and URS Corp.'s alleged omissions regarding the condition of the Building form the basis of 415 Congress's claims against URS Corp. (Supp. S.M.F. ¶19; Opp. S.M.F. ¶19.) 415 Congress alleges that URS Corp. owed it "a duty to perform [the PCA] with the degree of skill, care, and diligence ordinarily exercises by a building inspector" and that URS Corp. "breached its duty to perform its services with the degree of skill, care, and diligence ordinarily exercised by a building inspector." (Supp. S.M.F. ¶20; Opp. S.M.F. ¶20.) 415 Congress has retained an expert witness to testify on the standard of care. (Supp. S.M.F. ¶21; Opp. S.M.F. ¶21.)

---

[1]  ASTM standards are developed by ASTM International (formerly the American Society for Testing and Materials) for use in a variety of technical and engineering applications.
[2] Contrary to 415 Congress's denial of the statement of material fact (Opp. S.M.F. ¶14), the cited exhibit supports the statement that Harpers was the entity billed for the PCA. (*See* Mattson Depo. Exh. 22.)
[3]  Although this supporting statement of material fact is not supported by a record citation, the fact of the assignment was before the court in URS Corp. and URS Group, Inc.'s previous motion for summary judgment, supported by a copy of the assignment in the court's record. The court includes it because it is not disputed by 415 Congress, who only qualifies the statement to note that "[t]he document speaks for itself."

3

## DISCUSSION

### I.    Standard of Review

Pursuant to M.R. Civ. P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact set forth in those statements and that [the] party is entitled to a judgment as a matter of law." *See also Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733. A party wishing to avoid summary judgment must present a prima facie case for each element of the claim or defense that is asserted against it. *See Reliance Nat'l Indem. v. Knowles Indus. Svcs.*, 2005 ME 29, ¶ 9, 868 A.2d 220. "If material facts are disputed, the dispute must be resolved through fact-finding." *Arrow Fastener Co. v. Wrabacon, Inc.*, 2007 ME 34, ¶ 18, 917 A.2d 123 (quotation marks omitted). A factual issue is genuine when there is sufficient supporting evidence for the claimed fact that would require a fact-finder to choose between competing versions of the facts at trial. *See Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745.

### II.    Analysis

#### A.    *Ripeness*

As a threshold matter, 415 Congress argues that the court should not address the damage cap issue at this juncture in the case. First, 415 Congress argues that a limitation on damages should only be addressed after liability has been established, thus challenging the ripeness of URS Corp.'s motion. "Ripeness concerns the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Wagner v. Sec'y of State*, 663 A.2d 564, 567 (Me. 1995). The doctrine "[p]revent[s] judicial entanglement in abstract disputes" and "avoid[s] premature adjudication." *Johnson v. City of Augusta*, 2006 ME 92, ¶ 7, 902 A.2d 855.

4

415 Congress misconstrues the doctrine of ripeness to apply to individual claims in a complaint, broken down by elements of the cause of action. A case is ripe or not upon the filing of a complaint or other petition for judicial review based on whether "there exists a genuine controversy between the parties that presents a concrete, certain, and immediate legal problem." *Id.*; *accord Marquis v. Town of Kennebunk*, 2011 ME 128, ¶ 18, 36 A.3d 861. Whether the contractual damage cap applies is squarely before the court, representing a "genuine controversy and a concrete, certain, and immediate legal problem" between the parties. The doctrine of ripeness does not apply to prevent the Court's consideration of the motion.

415 Congress also argues that an "interlocutory ruling as to the scope of [its] damages" is unavailable by summary judgment. The court disagrees. M.R. Civ. P. 56(b) allows a defending party, such as URS Corp., to move for "summary judgment in the party's favor as to all or any part" of the claims against it. Damages or harm is an essential element for any negligence action, *see Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 10, 26 A.3d 787, and URS Corp. may move for partial summary judgment as to part of that claim.

B.    *Contractual Interpretation*

Because the damages cap on its face applies to claims for "unintentional breach of contract," and because there is no allegation of an intentional breach of contract on the part of URS Corp, (Supp. S.M.F. ¶ 23; Opp. S.M.F. ¶ 23), the cap plainly applies to Count I of the complaint. The primary dispute between the parties is as to Count II, and specifically it focuses on whether the claim in Count II is for "professional negligence" within the meaning of the damages cap provision.[4]

---

[4] Before 415 Congress's opposing statement was due, URS Corp. filed a supplemental supporting statement of material facts that added 7 facts for the court's consideration. 415 Congress generally objects to the supplemental statement as untimely. Because the court does not find the supplemental statements to be controlling to the outcome of the motion, the court does not address them or rely upon them.

URS Corp. asserts that the Agreement unambiguously limits its liability for claims arising out of the PCA because the PCA was a professional service and the contract limits "claims arising out of professional negligence, including errors, omissions, or other professional acts" to $250,000. (Supp. S.M.F. ¶7; Opp. S.M.F. ¶7.)

URS Corp. argues that professional services should be defined broadly, "so as to embrace all activities for which the specialized training of the particular profession is required." *Centennial Ins. Co. v. Patterson*, 564 F.3d 46, 53 (1st Cir. 2009). 415 Congress, on the other hand, argues that the meaning of "professional negligence" in the Agreement is ambiguous because it is not defined within the agreement and the term generally refers to negligence of doctors, lawyers, and other licensed professionals. 415 Congress asserts that inspecting buildings, while requiring a degree of experience, is not professional work in the same way that a doctor's or lawyer's practice is "professional," and thus negligent conduct of a building inspection is not professional negligence.

Interpretation of a contract and whether a contract term is ambiguous are both questions of law. *See Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶9, 748 A.2d 457. "A contract should be construed viewing it as a whole. An interpretation that would render any particular provision in the contract meaningless should be avoided." *McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 52 (Me. 1996). Likewise, any alleged ambiguity must be viewed in the context of the entire contract to determine if another provision resolves the ambiguity. *See id.* Further, "[i]t is a well established principle that a contract is to be interpreted to give effect to the intention of the parties as reflected in the written instrument, construed in respect to the subject matter, motive and purpose of making the agreement, and the object to be accomplished." *Estate of Barrows*, 2006 ME 143, ¶ 13, 913 A.2d 608 (quotation marks omitted).

6

"If a contractual provision is unambiguous, it will be given its plain, ordinary, and generally accepted meaning." *Villas by the Sea Owners Ass'n*, 2000 ME 48, ¶9, 748 A.2d 457. A contractual provision "is ambiguous if it is reasonably susceptible to more than one interpretation." *Madore v. Kennebec Heights Country Club*, 2007 ME 92, ¶7, 926 A.2d 1180; accord *Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶¶26-27, 1 A.3d 416.

The language in question is as follows:

**ARTICLE V – <u>Risk Allocation</u>.** The liability of URS, its employees, agents and subcontractors (referred to collectively in this Article as "URS"), for Client's claims of loss, injury, death, damage, or expense, including, without limitation, Client's claims of contribution and indemnification, express or implied, with respect to third party claims relating to services rendered or obligations imposed under this Agreement, including all Work Orders, shall not exceed in the aggregate:

> (1) The total sum of $250,000 *for claims arising out of professional negligence, including errors, omissions, or other professional acts,* and including unintentional breach of contract . . .

> (2) The total sum of $1,000,000 *for claims arising out of negligence,* breach of contract, or other causes for which URS has any legal liability, other than as limited by (1) above.

(Supp. S.M.F. ¶7; Opp. S.M.F. ¶7 (emphasis added).)

At the outset, it should be noted that the parties in this case used the same word in characterizing their contract as an "Agreement for *Professional* Services" (emphasis added) and in capping damages for "*professional* negligence" (emphasis added). There is absolutely no indication that the parties intended the word "professional" to mean one thing in the first context and something else in the other. Therefore, whatever the word "professional" might mean in other situations, the parties here agreed that it applied to any services rendered under the Agreement, as the PCA admittedly was. That undisputed fact alone arguably makes it unnecessary to parse the meaning of "professional," and compels the conclusion that any claim

7

relating to the services performed under the Agreement for Professional Services is subject to the "professional negligence" cap.

However. even if the focus instead is on whether "professional negligence" is an ambiguous term, the court concludes it is not ambiguous. The term "professional negligence" has a particular meaning under Maine law. *See Madore*, 2007 ME 92, ¶7, 926 A.2d 1180. "Professional negligence" is simply a variation of negligence, differing only by the standard of care, or duty owed by the defendant to the plaintiff. The standard of care in a typical negligence case is what an ordinary careful person would do or not do in the same situation, considering all the facts of the case. *See Fitts v. Central Me. Power Co.*, 562 A.2d 690, 693 n.2 (Me. 1989). The standard of care in a professional negligence case is the "failure to use such skill, judgment, prudence, and preparation as is reasonable for *an ordinarily competent [professional]* performing similar services under like conditions." Alexander, *Maine Jury Instruction Manual* § 7-78 at 7-82.1 (4th ed. 2011) (emphasis added).

Although 415 Congress cites to a number of decisions indicating that professional negligence is only applicable to doctors, lawyers, accountants, and other highly trained, licensed professionals, those cases are extra-territorial. The Law Court has clearly stated that "the standards for demonstrating the elements of professional negligence do not differ from profession to profession. The plaintiff in a professional negligence action must establish the appropriate standard of care, demonstrate that the defendant deviated from that standard, and prove that the deviation caused the plaintiff's damages." *Graves v. S.E. Downey Land Surveryor, P.A.*, 2005 ME 116, ¶ 10, 885 A.2d 779 (quotation marks and citation omitted). The cases cited by 415 Congress reflect a much narrower view of professional negligence than is applicable in Maine, and the Court does not find them persuasive.

Because "professional negligence" is not ambiguous, it should be given its "plain, ordinary, and generally accepted meaning." *Villas by the Sea Owners Ass'n*, 2000 ME 48, ¶9, 748 A.2d 457. Consistent with the Law Court's precedent, "professional negligence" is the failure to use such skill, judgment, prudence, and preparation in the course of rendering a service requiring skill, training and judgment as is reasonable for an ordinarily competent professional performing similar services under like conditions that results in injury or other loss to the plaintiff.

In addition, the Agreement itself distinguishes between "professional negligence" and "negligence," thus indicating that the parties understood and considered there to be two types of negligent conduct under the contract whose risk they were allocating and set the damage cap limits accordingly.[5] The pleadings themselves show that 415 Congress is not alleging that URS Corp. breached the standard of care of what an ordinary careful person would have done under the circumstances; 415 Congress alleges that URS Corp. owed it "a duty to perform [the PCA] with the degree of skill, care, and diligence ordinarily exercised *by a building inspector.*" (Supp. S.M.F. ¶20; Opp. S.M.F. ¶20 (emphasis added).) The fact that 415 Congress has hired an expert to elucidate the standard of care only reinforces this point. (Supp. S.M.F. ¶21; Opp. S.M.F. ¶21.)

A final and equally persuasive point is that, as noted at the outset, even if the term "professional" were ambiguous in some contexts, the fact that the parties labeled their contract

---

[5] 415 Congress suggests that under URS Corp.'s interpretation of the contract, all services performed would be professional services, essentially writing the ordinary negligence cap out of the contract. The court disagrees with this characterization. Had Mr. DiNicola driven his car into the building upon arrival, or left a ladder in a precarious position that caused someone injury, or loosened a piece of the façade that later fell and injured a passer-by—all those examples would fall under the ordinary negligence damages cap.

In fact, 415 Congress's position that none of URS Corp.'s work constituted "professional services" would truly do the opposite—write the professional negligence cap out of the contract.

as an "Agreement for Professional Services" virtually compels the inference that the cap on damages for "professional negligence" applies to claims arising out of such services.

## CONCLUSION

The $250,000 damages cap applies to "claims arising out of professional negligence, including errors, omissions, or other professional acts, and including unintentional breach of contract . . . " Because Count I is a claim for breach of contract in which there is no allegation that the breach was intentional, and because Count II is a professional negligence claim arising out of services that the parties themselves labeled as "professional services," the cap applies to both counts.

Defendant URS Corp.'s Motion for Summary Judgment, or, in the Alternative, Motion *in Limine* for an Order Enforcing the $250,000 Contractual Damages Cap is GRANTED. The Plaintiff 415 Congress's recovery against URS Corp. under Counts I and II of the complaint shall be and is limited to $250,000 in damages, exclusive of interest and costs.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this Order by incorporation in the docket.

Dated July 30, 2012

A. M. Horton
Justice, Business and Consumer Court

10

BCD-CV-11-03

415 Congress Street
Properties, LP, and
Harpers Development, LLC.

          Plaintiffs

v.

URS Corporation and T.F.
Properties, Inc.,

          Defendant's

Attorneys:

For Plaintiff:  Timothy Bryant, Esq.
               Preti Flaherty
               Thomas McKeon, Esq.
               Richardson Whitman Large & Badger

URS Corporation:    Harold Friedman, Esq.
                      Brett Leland, Esq.
                      Friedman Gaythwaite Wolf & Leavitt

TF Properties:      Leslie Lowry, Esq.
                      Jensen Baird